# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

**WILLIE KENT PARSONS,**

> **Plaintiff,**

**vs.**                                              **CIVIL ACTION NO. 2:15-14376**

**CAROLYN W. COLVIN**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY,**

> **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II and Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered January 5, 2016 (Document No. 8.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 11 and 12.)

The Plaintiff, Willie Kent Parsons (hereinafter referred to as "Claimant"), protectively filed his applications for Title II and Title XVI benefits on September 24, 2012, alleging disability since that date as a result of sleep apnea and kidney stones.[1] (Tr. at 369.) His claims were denied on

---

[1] In his Disability Report – Appeal, dated January 31, 2013, Claimant alleged additional impairments: cyst, kidney problems, ADHD, ODD, bipolar, back pain, and migraines. (Tr. at 383.) In another Disability Report – Appeal, dated February 25, 2013, Claimant alleged that since February 1, 2013, his kidney stones were getting worse and that he was having more difficulty sleeping. (Tr. at 387.) In addition, under the "Remarks" heading, Claimant alleged that he was being treated for depression. (Tr. at 390.)

December 28, 2012 (Tr. at 130-135.) and again upon reconsideration on February 11, 2013. (Tr. at 144-146, 147-149.) Thereafter, Claimant filed a written request for hearing on February 22, 2013. (Tr. at 142-143.) An administrative hearing was held on January 24, 2014 before Administrative Law Judge ("ALJ") Michele Kelley. (Tr. at 25-67.) The ALJ heard the testimonies of Claimant (Tr. at 37-52.) and Vocational Expert ("VE") Anthony T. Michael, Jr. (Tr. at 53-65.) Because Claimant's representative requested a psychological consultative evaluation during opening statement, the record was left open to accommodate same. (Tr. at 35, 77-78.) Another administrative hearing was held on February 3, 2015[2], before ALJ Jerry Meade (Tr. at 68-89.), who heard additional testimony by Claimant. (Tr. at 73-77.) Another supplemental hearing was scheduled in order to allow time for an updated opinion from the consultative evaluator, Dr. Stuart Gitlow, M.D. (Tr. at 77-78.) Subsequently, on April 15, 2015, a hearing was held before ALJ Meade again, during which Claimant testified again (Tr. at 82-85.) as well as VE Gina Baldwin. (Tr. at 86-88.) On July 2, 2015, the ALJ entered a decision finding Claimant was not disabled. (Tr. at 8-24.)

The ALJ's decision became the final decision of the Commissioner on September 10, 2015 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-5.) On October 27, 2015, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Standard

---

[2] The supplemental hearing was going to be held by video conferencing on August 5, 2014 before ALJ Kelley, however, upon a request declining the video hearing submitted by Claimant's representative, and due to the transfer of ALJ Kelley, the matter was reassigned to ALJ Meade. (Tr. at 247.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . .." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and

(2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None,

one or two, three, four or more. The last point on each scale represents a degree of
limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA

determines their severity. A rating of "none" or "mild" in the first three functional areas (activities

of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth

(episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless

evidence indicates more than minimal limitation in the claimant's ability to do basic work

activities.  20  C.F.R.  §§  404.1520a(d)(1)  and  416.920a(d)(1).[3]  Fourth,  if  the  claimant's

impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe

impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate

listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental

disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the

claimant has a severe mental impairment(s) which neither meets nor equals a listed mental

disorder, the SSA assesses the claimant's RFC. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3).

The Regulation further specifies how the findings and conclusion reached in applying the

technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written
> decision issued by the administrative law judge and the Appeals Council must
> incorporate the pertinent findings and conclusions based on the technique. The

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed
severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B)
they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining
social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of
decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective
disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities
with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of
decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental
demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years'
inability to function outside a highly supportive living arrangement, and the indication of a continued need for such
an arrangement.

> decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4) and 416.920a(e)(4).

In this particular case, the ALJ determined that Claimant last met the requirements for insured worker status through December 31, 2017. (Tr. at 13, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairments: degenerative disc disease of the cervical spine; obesity; borderline intellectual functioning; major depressive disorder; and antisocial personality disorder. (Id., Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 16, Finding No. 4.) Next, the ALJ found that Claimant had a residual functional capacity ("RFC") to perform medium work as defined in the regulations:

> He can occasionally crawl and climb ladders, ropes, or scaffolds. He can frequently climb ramps/stairs, balance, stoop, kneel and crouch. He must avoid concentrated exposure to extreme heat; irritants such as fumes, odors, dust, gases, and poorly ventilated areas; and hazards such as moving machinery and unprotected heights. The claimant can understand, remember, and carry out simple instructions. He can have only occasional changes in the work setting. He can have occasional interaction with the public, coworkers, and supervisors. (Tr. at 19, Finding No. 5.)

At step four, the ALJ found that Claimant was incapable of performing past relevant work. (Tr. at 23, Finding No. 6.) At step five of the analysis, the ALJ found that Claimant was a younger individual, and that there had been no change in age category to date. (Id., Finding No. 7.) The

ALJ found that Claimant had a limited education, and was able to communicate in English. (Id., Finding No. 8.) Employing the Medical-Vocational Rules as a framework, the ALJ determined that Claimant was not disabled, that transferability of job skills was immaterial to the determination of disability, as Claimant's age, education, work experience, and residual functional capacity indicated that there were other jobs existing in significant numbers in the national economy that Claimant could perform. (Id., Finding Nos. 9 and 10.) On that basis, the ALJ found Claimant was not disabled. (Tr. at 24, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Issue on Appeal

This appeal primarily concerns whether the ALJ failed to properly evaluate the opinion of State agency psychological examiner Kara Gettman-Hughes, M.A. in assessing Claimant's RFC and ultimately, in denying him benefits.

Claimant's Background

At all times herein, Claimant was considered a "younger individual" pursuant to the Regulations; he was thirty-five years old when the ALJ issued his decision. (Tr. at 23.) See 20 C.F.R. §§ 404.1563(c), 416.963(c). He completed the eleventh grade and had attended special education for all subjects. (Tr. at 763, 765.) His past relevant work experience included automotive repair, a fast food restaurant and convenient store cashier, a construction laborer, and self-employment providing lawn care. (Tr. at 370.)

The Relevant Evidence of Record

Claimant's Mental Impairments:

The medical evidence of record included treatment notes from Prestera Center, where Claimant primarily treated for an episodic mood disorder, opioid dependency, and other unknown and unspecified cause of morbidity and mortality ("Unkn cause morb/mort NEC") with a rule out indicated for Cluster B personality traits. (Tr. at 500-516, 544-553, 831-900, 912-918.) Claimant was consistently observed during mental status examinations to have a disheveled appearance (Tr. at 500, 512.) to demonstrate avoidant and decreased eye contact (Tr. at 500, 506, 512, 545-546, 549, 840-842, 866, 971-872.), to have a defensive, uncooperative, and hostile attitude during interviews (Tr. at 500, 512, 549, 834-836, 866-867.), to have a labile affect (Tr. at 513, 549, 840-842, 866-867, 871-872.), and to have increased and repetitive motor activity. (Tr. at 500, 507, 513, 545-546, 549, 834-836, 840-842, 866-867, 913-914.)

On February 13, 2013, Claimant attended an initial psychiatric evaluation at Mason County Medical Services. (Tr. at 514.) Lisa Kearns, APRN, diagnosed him with an episodic mood disorder; opioid dependence in partial remission; posttraumatic stress disorder (PTSD); intermittent explosive disorder; and developmental delay, not otherwise specified. (Id.) Nurse Kearns prescribed Depakote and Buspar. (Tr. at 515.) On March 20, 2013, Claimant reported that the medications were not helping him, and he had stopped taking Buspar the week before. (Tr. at 517.) Nurse Kearns increased Claimant's Depakote and discontinued Buspar. (Tr. at 520.) On April 17, 2013, Claimant reported improvement in his symptoms because he was no longer lashing out or becoming verbally or physically aggressive. (Tr. at 523.) Nurse Kearns continued him on Depakote. (Tr. at 526.) In June and July of 2013, Claimant presented as anxious and fidgety, and Nurse Kearns prioritized mood stabilization treatment. (Tr. at 544-553.)

Psychiatric Hospitalizations

On August 5, 2013, Claimant went to the emergency room at Thomas Memorial Hospital with complaints of suicidal thoughts and a desire to detox and stop using drugs. (Tr. at 564.) He had previously attempted to cease opiate dependency on his own but experienced significant physical and psychosocial withdrawal symptoms. (Tr. at 569.) Claimant was admitted to the hospital's behavioral health unit, where he was treated for opiate withdrawal symptoms and given Ambien, Geodon, and Vistaril, in addition to the psychotropic medications that he took in an outpatient setting. (Tr. at 569-570.) Claimant was advised that his medications would not fully work unless he stopped abusing opiates. (Tr. at 570.) He was discharged from the hospital on August 9, 2013. (Tr. at 569-571.) Upon discharge, Claimant was diagnosed with opiate dependency, opiate withdraw, substance-induced mood disorder, and personality disorder, and was

assigned a global assessment of functioning ("GAF") score of 35/40. (Tr. at 569.) It was further noted that Claimant's opiate withdrawal symptoms had decreased, and his suicidal ideation had fully resolved with some overall decrease in his mood and anxiety symptoms. (Tr. at 570-571.) He was advised to follow up with Prestera Center for both his substance abuse and mood and anxiety treatment. (Tr. at 571.)

On October 8, 2013, Claimant went to the emergency room after attempting suicide by hanging himself with a telephone cord. (Tr. at 792.)  He admitted that he tried to kill himself the day before by jumping out of a moving vehicle, and he had excoriation with bruising and tenderness on his left lower abdomen and some bruising of his left hip. (Tr. at 798.)  Claimant was depressed because he and his fiancée had broken up and she was withholding visitation with his son. (Id.) According to notes in the file, he was expected to be hospitalized for three to five days (Tr. at 806.); however, no discharge summary was available in the record, and Claimant appeared to have been transferred to another psychiatric facility for care. (Tr. at 796.) A urine drug screen confirmed Claimant was not under the influence of opiates or other illegal or non-prescribed substances. (Tr. at 794.)

On January 2, 2014, Claimant was brought to the hospital by EMS after he tried to hang himself from a tree in his father's yard. (Tr. at 775.) He was reportedly unconscious at the time his father cut him down from the tree, but regained consciousness and was walking around the scene. (Id.) Claimant was observed to have moderate soft tissue tenderness of his upper, mid, and lower neck area bilaterally and a small abrasion anteriorly. (Tr. at 775-776.) His drug screen was negative for illegal and non-prescribed substances. (Tr. at 778.) Claimant was having difficulty with getting his fiancée to provide financial support their children and problems obtaining food stamps. (Tr. at

809.) He was diagnosed with bipolar disorder, depressed, severe without psychosis, and suicide precautions were initiated. (Tr. at 807-808.) By January 5, 2014, Claimant felt he was sufficiently stable to return home, and he was discharged to his home with arrangements for follow up treatment. (Tr. at 808.) Upon his discharge, Claimant was appropriately dressed and groomed, there were no medication side effects noted, he was pleasant and cooperative, his mood was euthymic, his affect was appropriate, and he had no suicidal or homicidal ideation or psychotic symptoms. (Id.)

State Agency Psychological Examiner:

On February 26, 2014, Psychologist Kara Gettman-Hughes evaluated Claimant at the request of the ALJ. (Tr. at 762-773.) Ms. Gettman-Hughes had the following records available for her review: (1) Medical Services note dated July 19, 2013 including the diagnoses of Mood Disorder, Not Otherwise Specified, Polysubstance Dependence, Posttraumatic Stress Disorder, Impulse Control, Not Otherwise Specified, and Learning Disorder, Not Otherwise Specified; (2) Disability Report Appeal SSA-3441; (3) Doctor's note dated August 6, 2013 by Dr. Romaine with references to suicidal ideation, depression, and hypercalcemia; (4) Kanawha County Schools psychological evaluation, dated January 4, 2005 including a WISC-III Full Scale IQ of 81; and (5) Thomas Memorial Hospital, note dated August 9, 2013 with a discharge diagnosis of Opioid Dependence, Opioid Withdrawal, Substance-Induced Mood Disorder and Personality Disorder, Not Otherwise Specified.

Ms. Gettman-Hughes described Claimant to have a disheveled appearance with poor hygiene and to appear older than his stated age. (Tr. at 767.) During the evaluation, Claimant was "somewhat cooperative" and he had poor eye contact. (Id.) Other relevant findings during the

mental status examination included speech that was responsive and coherent but verbose; an observed mood remarkable for anxiety with an exaggerated affect; flight of ideas; poor judgment and insight; significant psychomotor agitation; poor remote memory; poor concentration; moderately impaired persistence, and variable pace. (Id.) Psychologist Gettman-Hughes noted Claimant's social functioning to be moderately impaired. (Tr. at 768.) She diagnosed him with mood disorder NOS, generalized anxiety disorder, alcohol dependence sustained full remission, opioid dependence sustained full remission, borderline intellectual functioning, and personality disorder. (Id.) She indicated his prognosis was poor. (Tr. at 769.)

Ms. Gettman-Hughes administered intelligence and achievement testing but found the results to be invalid because Claimant did not appear to put forth maximum effort and did not use the allotted time to complete the tests. (Tr. at 765-768.) Notwithstanding the invalid results, Psychologist Gettman-Hughes stated Claimant "may experience great difficulty in keeping up with his peers in a wide variety of situations that require thinking and reasoning abilities." (Tr. at 765.)

Ms. Gettman-Hughes completed a mental assessment of ability to do work-related activities, and opined that Claimant had marked limitations in his ability to make judgments on complex work-related decisions, and moderate restrictions in his ability to understand and remember complex instructions and in carrying out complex instructions. (Tr. at 770.) She also opined that Claimant's insight, judgment, and concentration were poor; that his immediate memory is mildly impaired; his short-term memory intact; and his persistence moderately impaired. (Id.) Psychologist Gettman-Hughes also stated Claimant would have marked limitations in his ability to respond appropriately to usual work situations and to changes in a routine work setting as a result of his multiple mental impairments. (Tr. at 771.)

State Agency Medical Consultant:

Medical Interrogatory – April 19, 2014 – Stuart Gitlow, M.D., M.P.H.

Dr. Gitlow reviewed Claimant's file[4] in response to ALJ Kelley's medical interrogatories and completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental). (Tr. at 813-821.) Dr. Gitlow stated Claimant had low average to borderline intellectual abilities based on intelligence testing during his childhood. (Tr. at 813.) He noted Claimant's suicide attempt in January 2014 and indicated Claimant suffered from major depressive disorder based on the negative toxicology, and "[a]lthough this has caused several episodes of brief decompensation, the claimant does not show longitudinal evidence of a moderate or marked impairment." (Id.) Dr. Gitlow also stated Claimant had a personality disorder with moderate impairments of social functioning, but overall, did not meet or equal any mental listing. (Id.) Dr. Gitlow indicated Claimant would have moderate limitations in his ability to make judgements on complex work-related decisions; to interact appropriately with the public, coworkers, and supervisors; and to respond appropriately to usual work situations and to changes in a routine work setting. (Tr. at 819-820.) Dr. Gitlow opined Claimant could manage his own benefits. (Tr. at 821.)

Medical Interrogatory – February 15, 2015 – Stuart Gitlow, M.D., M.P.H.

Dr. Gitlow again reviewed Claimant's file in response to ALJ Meade's medical interrogatories and completed an updated opinion and Medical Source Statement of Ability to Do Work-Related Activities (Mental). (Tr. at 901-911.) Dr. Gitlow reiterated his previous responses from April 2014 but since his review of additional records from Prestera, he noted that from January to April 2014, Claimant experienced an episode of decompensation, because he went off

---

[4] The record indicates that for both requests to respond to interrogatories by the ALJ, Dr. Gitlow was provided compact discs of the evidence of record. (Tr. at 814, 901.)

his medication in March, but once he became compliant with medications in April 2014, his condition had improved to the levels he found in his prior report. (Tr. at 902-903.) Dr. Gitlow stated that in consideration for additional records from Prestera, he opined Claimant to have mild deficiencies in activities of daily living; moderate limitations in social functioning, mild limitations in concentration/persistence/pace, and one episode of decompensation. (Tr. at 903.) Dr. Gitlow further stated that with medication for his psychiatric condition and continued abstinence [from alcohol and illicit drugs], Claimant would be able to perform simple occupational tasks with limited contact with the public, coworkers, and supervisors. (Id.) Dr. Gitlow indicated Claimant would have moderate limitations in his ability to understand and remember complex instructions; to carry out complex instructions; to make judgements on complex work-related decisions; to interact appropriately with the public, coworkers, and supervisors; and to respond appropriately to usual work situations and to changes in a routine work setting. (Tr. at 904-906.) Dr. Gitlow opined that Claimant would not be able to manage benefits in his own best interest. (Tr. at 906.)

<u>The Administrative Hearings</u>

<u>Claimant Testimony January 24, 2014:</u>

Claimant testified he had broken his glasses during his latest suicide attempt a couple weeks prior to the hearing. (Tr. at 37.) He stated that his fiancée of thirteen years had left three small children with him before Thanksgiving, that his ABT funds for the month were missing, and that he was unable to feed the children. (Tr. at 42.) He explained, "I just broke down. It's all been…piling up on me." (Id.) Claimant stated his fiancée wanted to continue using drugs, and he wanted to get clean and take care of the children. (Tr. at 43.)

He admitted to previously using marijuana, pain killers, and alcohol to help with his

depression and anxiety over not being able to read and feeling like a "bastard" because his birth was a result of his mother being raped. (Tr. at 38.) He stated he had been clean for six months since being hospitalized in August 2013 but continued to suffer from "intensive" depression, anxiety, and hopelessness. (Id.) Claimant testified that he received group therapy three hours a day, five days a week and took prescription medication for bipolar, anxiety, and insomnia. (Tr. at 39.)

Claimant stated he had problems with fighting and behavior in school and did not graduate. (Tr. at 40.) He stated he had learning disabilities that interfered with his job performance. (Id.) He explained that he had difficulty doing what he was supposed to do and walked away from jobs. (Tr. at 41.) He stated he felt "broken" and struggled every day to take care of himself. (Id.)

Claimant explained that while his report cards reflected good grades, they were a product of being in special education classes. (Tr. at 44.) He stated, "They want to push you through where you're not – they don't have to deal with you anymore." (Id.) Claimant clarified he was in special education for the entire day and in every class except physical education. (Tr. at 45.) He reiterated that he was unable to read and write. (Id.) In explaining the numerous absences from his educational records, Claimant testified that he attended school in a mental hospital twice, "being tested like a lab rat." (Tr. at 47.)

Claimant testified he had been living in a tent for about three or four weeks on his father's property until his fiancée gave him the children, and since then, he had been living with his father in a trailer with the children. (Tr. at 47-48.) Before that, he lived with his fiancée and his children and her parents in one room. (Tr. at 48.) He stated he had lost 75 pounds in the last six months because he cannot sleep or eat and did not have the desire to do anything. (Tr. at 49.) On a typical day, Claimant stated he helped his children get ready for school and walked them to the bus stop.

(Id.) He then would wait for his transportation to his intensive treatment program, attend the program, and then return to take care of his children after school. (Tr. at 50.) Claimant stated he cooked breakfast and dinner for his children. (Id.) He admitted his father often helped him with the children, at least every half hour or 45 minutes, because he did not want them to see him "breaking down" and crying from the stress. (Tr. at 51.)

Anthony T. Michael, Jr., Vocational Expert ("VE") Testimony:

The VE classified Claimant's past work to include cashier (DOT No. 211.462-010) at the unskilled, light level; auto body repair helper (DOT No. 807.687-010) at the unskilled, medium level; lawn care worker (DOT No. 406.684-014) at the semiskilled, medium level; and construction laborer (DOT No. 869.687-026) at the unskilled, very heavy level. (Tr. at 55.) The VE also answered a hypothetical posed by both the ALJ, in response to which, the VE testified that Claimant was unable to perform his past relevant work, but was able to perform other jobs at medium, light, and sedentary levels. (Tr. at 57.) However, with the additional limitation of being off task for 20% of an eight-hour work day, the VE testified that there would be no jobs available. (Tr. at 58.)[5]

Claimant Testimony January 3, 2015:

Claimant testified that since the last hearing, he had been going to Prestera for therapy and medication to treat insomnia and depression, but he had been trying to "hold it together" since he has three children that he is taking care of himself and had an upcoming custody hearing. (Tr. at

---

[5] Additional hypotheticals and questions were asked of the VE by Claimant's attorney, with regard to what jobs were available to an individual with Claimant's limitations, specifically only requiring an academic or reading level between first and sixth grade as well as with limited or superficial contact (less than 30% of the day) with coworkers and supervisors, however, the transcript indicates that there was much confusion with the additional hypothetical limitations, and Claimant's counsel discontinued questioning to reserve for proffer since the ALJ stated she would send Claimant for a psychological consultative examination. (Tr. at 58-66.)

73.) His parents help him with raising his children, doing their homework, feeding them, and taking care of the bills. (Tr. at 74.) He stated counseling did not really help, but he was able to talk to someone and open up. (Id.) He stated he attended counseling twice a month when he had transportation, and had not been able to go for approximately six weeks, but had an appointment later in the month. (Id.) Claimant explained that medication did not help with his depression symptoms, and he continued to "break down" about four or five times a day. (Id.) He described a "break down" as crying for 60 to 90 minutes and having suicidal thoughts. (Tr. at 75.) He indicated he had trouble sleeping, was unable to use his sleep apnea machine, and was afraid of the dark since attempting suicide. (Id.) He stated sleep medication did help "a little bit," but he did not want to become addicted to sleeping pills. (Tr. at 76.)

Claimant testified he was unable to work because he cannot succeed and is always breaking down. (Id.) He explained that he had attempted to do lawn care as a form of self-employment but was unable to maintain the records and had difficulty with kidney stones. (Tr. at 77.) He stated he signed up for "West Virginia work" every month to apply for other kinds of work. (Id.)

Claimant Testimony April 15, 2015:

Claimant testified that he continued to have break downs three to four times a day, which require him to leave the room while he cried and shook. (Tr. at 82.) He stated his parents still helped him with the children. (Tr. at 83.) He indicated he had kidney stones every couple of months and had previously required a stent and "laser blast." (Id.) He stated he usually passed the stones on his own because the doctors sent him home to do that anyway. (Id.) Claimant testified that the kidney stones were painful and stop him from moving and sleeping. (Id.) He explained that he does not sleep much due to insomnia and feels tired during the day. (Tr. at 83-84.)

Gina Baldwin, Vocational Expert Testimony:

The VE classified Claimant's past work as a convenience store cashier at the unskilled, light level; automobile repairer at the skilled, medium level; lawn care worker at the semiskilled, medium level; and stock clerk at the unskilled medium level, and construction laborer at the unskilled, very heavy level. (Tr. at 86.) The ALJ then asked the VE to consider a hypothetical individual with Claimant's vocational profile and RFC to which the VE responded that the individual could not perform any of Claimant's past work but could perform work at the unskilled, medium level as a sorter or store laborer; at the unskilled, light level as a product inspector or small parts assembler; or at the sedentary level as a weigher or table worker. (Tr. at 86-87.) The VE stated that an additional limitation of being "off task 20 percent of each work day" would eliminate all unskilled work. (Tr. at 87.) The VE also confirmed that no work would be available for an individual who had a "marked" limitation in the ability to respond appropriately to usual work situations and to changes in a routine work setting. (Id.)

Claimant's Challenges to the Commissioner's Decision

Claimant contends that the ALJ failed to properly evaluate Ms. Gettman-Hughes's opinion under the Regulations, and instead relied upon Dr. Gitlow's flawed opinion, which was less consistent with the clinical findings recorded in the Prestera treatment notes than Psychologist Gettman-Hughes's opinion. (Document No. 11 at 11-18.) Claimant argues that the ALJ gave little weight to Psychologist Gettman-Hughes's medical source statement based on his finding that it was inconsistent the objective evidence of record as summarized by Dr. Gitlow and because he found it inconsistent with Dr. Gitlow's opinion. (Id. at 14.) However, Claimant contends that the ALJ failed to consider Psychologist Gettman-Hughes's comprehensive psychological examination

findings or report, and he did not provide any further explanation as to how her opinion was inconsistent with the evidence of record. (Id.) Instead, the ALJ solely relied on the opinion of Dr. Gitlow who, as a non-examining consultant, which would not have been entitled to as much weight under the Regulations, not only because Dr. Gitlow provided a "cursory summary of the relevant medical evidence" supporting his opinion, but his opinion was inaccurate when examined with the Pretera treatment records of the same time period.[6] (Id. at 14-16.) Claimant argues that Psychologist Gettman Hughes's opinion is far more consistent with the Prestera records, and had the ALJ given proper weight to her opinion, he would have found Claimant disabled. (Id. at 16-17.) Because legal standards were not followed, remand is appropriate. (Id. at 17-18.)

The Commissioner responds that the ALJ's decision is supported by substantial evidence because the ALJ thoroughly reviewed the evidence and provided adequate explanation for his findings as well as for the RFC assessment. (Document No. 12 at 9-13.) The Commissioner also argues that contrary to Claimant's argument otherwise, the ALJ did review Ms. Gettman-Hughes' opinion and explained why it did not correspond with the evidence of record, and that Dr. Gitlow's opinion was more consistent by comparison. (Id. at 10-11.) Further, the ALJ took note that Dr. Gitlow found that Claimant's mental condition was stable when he was compliant with medication, which has been held as a non-disabling condition per Gross v. Heckler, 785 F.2d 1163, 1165-1166

---

[6] Specifically, Claimant states that Dr. Gitlow referenced treatment entries from Prestera dated April 9, 2014 and October 14, 2014, and that he omitted "every single mental status examination report" that were contained in over two years' worth of Prestera records. (Id. at 14-15.) Claimant argues that in his February 15, 2015 responses to the ALJ's interrogatories, Dr. Gitlow mentions a treatment note from April 9, 2014, and that "[n]otably, *there is no treatment record from April 9, 2014* in the administrative record." (Id. at 15, emphasis in original.) Further, Claimant takes issue with Dr. Gitlow's summary of Prestera's October 14, 2014 report, from which he noted Claimant had "an otherwise normal mental status" and argues that Dr. Gitlow ignored other evidence in the report of Claimant's anxiety, stress, decreased eye contact, and other continued mental health problems. (Id. at 15-16.) Claimant also complains of Dr. Gitlow's insinuation that Claimant was not completely abstaining from alcohol, based on his finding that Claimant had "only a partial remission from alcohol dependence." (Id. at 15.) These arguments are discussed *infra*.

(4th Cir. 1986). (Id. at 11-12.) The Commissioner argues that the ALJ's RFC assessment complied with Claimant's limitations, and that based on his "credibly established limitations", the hypothesis posed to the VE indicated that there were numerous jobs in the national economy that Claimant could perform, and was therefore, not disabled based on the substantial evidence. (Id. at 12-13.)

Analysis

The issue presented in this case is whether the ALJ failed to abide by the Regulations when he gave less weight to the opinion of State agency examiner, Psychologist Gettman-Hughes, than he did to the opinion of State agency consultant, Dr. Gitlow, and whether that error was harmless. The Regulations provide that every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c). These factors include (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Under §§ 404.1527(c)(1) and 416.927(c)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(c)(3) and (4) and 416.927(c)(3) and (4) address the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given) and consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of State agency medical and psychological consultants. See 20 C.F.R. §§ 404.1527(e)(2)(ii) and 416.927(e)(2)(ii). The ALJ, however, is not bound by any findings made by State agency medical or psychological consultants. 20 C.F.R. §§ 404.1527(e)(2)(i) and 416.927(e)(2)(i).

Because the main contention at issue in this case concerns the opinions provided by Dr. Gitlow and Psychologist Gettman-Hughes, it is important to review the ALJ's examination and treatment of those respective opinions. With respect to Dr. Gitlow, the ALJ noted he forwarded Claimant's case to him for review, and that Dr. Gitlow was provided with Claimant's entire record, except for the Prestera treatment records dated February 20, 2015, which were dated five days after Dr. Gitlow's latest responses to medical interrogatories.[7] (Tr. at 15.) As noted supra, the ALJ found Dr. Gitlow's conclusions "well reasoned and well supported by the evidence of record", and found Claimant had low average to borderline intellectual abilities based on Claimant's school testing records as well as Psychologist Gettman-Hughes's invalidation of the more recent testing of Claimant's abilities. (Id.) Further, the ALJ accepted Dr. Gitlow's findings of Claimant's major depressive disorder, "based on the suicide attempt in the context of negative toxicology" as well as his findings of Claimant's antisocial personality disorder that imposed moderate impairment in social functioning. (Id.)

The ALJ found Claimant had only mild impairment in activities of daily living with regard to his mental functioning: though at times Claimant presented as disheveled at times, he had also presented well-groomed, further, the ALJ noted that Ms. Gettman-Hughes's evaluation report

---

[7] The ALJ provided a review of this more recent medical evidence and noted that it was a follow-up appointment at Prestera and that Claimant was reportedly "antsy" and "had not been sleeping" and still involved in a custody battle over his children and going to court in March 2014. (Tr. at 21.) The ALJ further noted that Claimant was reportedly aggravated and overwhelmed, but admitted that he was out of medication and did feel better when properly medicated. (Tr. at 21-22.) The ALJ further noted that this recent treatment record indicated that Claimant was cooperative, "and despite some noted agitation and restlessness, affect was expansive." (Tr. at 22.) The ALJ noted that the treatment records also reported that Claimant exhibited fair attention/concentration, normal speech, intact memory, no abnormal thoughts, judgement was "no more than moderately impaired, and he retained partial insight." (Id.) Further, Claimant reportedly denied homicidal or suicidal ideation; no crisis intervention was needed, and only routine follow-up was indicated. (Id.) Finally, the ALJ noted that no additional evidence had been submitted to support any further worsening of Claimant's condition that warranted a different conclusion, therefore, he found Dr. Gitlow's conclusions remained reasonable. (Id.)

indicated that Claimant had exaggerated behaviors. (Tr. at 17.) Based on Claimant's self-report that he is capable of preparing his own meals, going out alone, arranging for transportation when needed, shopping, paying bills, count change and handle his own finances, as well as Ms. Gettman-Hughes's finding that Claimant can manage his own benefits, the ALJ found further evidence supporting his finding that he was only mildly impaired in activities of daily living. (Id.) Because Claimant also admitted to assisting his children with getting up, off, and ready for school, and playing with them, as well as meeting them at the bus after school, watching television, and signing up for West Virginia Works monthly, the ALJ found this evidence also provided support for his finding of mild impairment in activities of daily living, and afforded Dr. Gitlow's opinion finding same "great weight". (Id.)

The ALJ also found Dr. Gitlow's opinion that Claimant had moderate limitations in social functioning based on his diagnosis of antisocial personality disorder and was substantiated by the record, which indicated that Claimant's educational history was "remarkable for an 'out-of-school placement'" because of his behavior. (Id.) The ALJ noted that Prestera Center records indicated that Claimant initially sought help for his irritability with others and anger; his legal history was positive for assault and battery as a juvenile; and the records noted Claimant presented as guarded and defensive. (Id.) Therefore, the ALJ found no more than occasional contact with the public, coworkers and supervisors an appropriate workplace setting for Claimant. (Id.)

With regard to Claimant's intellectual functioning, the ALJ again noted that Ms. Gettman-Hughes invalidated Claimant's WAIS-IV testing, and found him capable of managing his own funds. (Tr. at 18.) The educational records indicated that Claimant was working towards a standard diploma as opposed to a modified one; he reported being relatively independent in his daily living;

his mental status examinations at Prestera Center indicated that he was mentally alert and oriented to all spheres and only had brief episodes of decompensation, leading the ALJ to conclude that Dr. Gitlow's assessment that with continued compliance with medication and abstinence, Claimant is capable of simple occupational tasks. (Id.)

The ALJ addressed Claimant's episodes of decompensation in August 2013, October 2013, and January 2014, and that Dr. Gitlow noted these episodes did not reflect an extended duration as required by the Regulations. (Id.) The ALJ practically reproduced Dr. Gitlow's findings from both interrogatories *verbatim* (Tr. at 20-21.), and further accredited his level of expertise, as well as his supportive rationale to his opinions, with "great weight". (Tr. at 21.) Despite the additional evidence from Prestera, the ALJ "accepts Dr. Gitlow's conclusions remain reasonable." (Tr. at 22.) The ALJ also discussed Psychologist Gettman-Hughes's opinion, noting her findings that Claimant had: mild impairments in his ability to understand, remember, carry out simple instructions, and make judgments on simple work-related decisions; moderate impairment in the ability to interact appropriately with the general public, supervisors and coworkers; as well as marked impairment in the ability to respond appropriately to usual work situations and to changes in a routine work setting. (Id.) Ultimately, the ALJ thought Ms. Gettman-Hughes's opinion was "inconsistent with the objective evidence of record (as summarized by medical expert Dr. Gitlow) and the conclusions of Dr. Gitlow", and afforded it "little weight". (Id.) The ALJ further explains that he gave more weight "to the details and chronology of the record, which more accurately describes the claimant's impairments and limitations." (Id.)

With regard to Claimant's assertion that there is no treatment record from April 9, 2014, the undersigned notes that Dr. Gitlow's February 15, 2015 responses to the ALJ's interrogatories

mention a "mental status exam on 4/9/14". (Tr. at 902.) A review of the administrative record indicates that Claimant presented to Prestera on July 18, 2014, and there is a heading "Mental Status Exam (r 4.09.14)" (Tr. at 834.) which details several observations of Claimant that Dr. Gitlow discussed in his report to the ALJ. The undersigned notes that there are several entries in the Prestera treatment records with what would appear to be dates from April 2014: "(R 04.30.2014)" (Tr. at 831.); "(R 4.29.2014)" (Tr. at 833.); and "(R-04.30.14)", "(r 4.09.14)". (Tr. at 834.) There are other 'dates' throughout Prestera's records: "(r 1/2013)"; "(r-1/24/2012)"; "(r-1/24/2012)" (Tr. at 840.); "(r-05/2013)" (Tr. at 843.); "(r 6/20/2012)" (Tr. at 866.); "(r 6/20/2012)" (Tr. at 867.); "(r 6/20/2012)" (Tr. at 868.); "(r 6/20/2012)" (Tr. at 871.); "(r 6/20/2012)" (Tr. at 872.); "(r 6/20/2012)" (Tr. at 874.); "(r04.03.14)" (Tr. at 876.); "(R 4.03.2014)" (Tr. at 877.); "(4.03.14)" (Tr. at 882.); "(R 4.11.2014)" (Tr. at 885.); "(r 4.30.14)" (Tr. at 886.); "(R 4.30.2014)" (Tr. at 887.); "(r4.04.14)" (Tr. at 888.); "(R 4.30.14)"; "(R 4.11.14)" (Tr. at 890.); "(r 4.30.14)" (Tr. at 892.); "(r 12.11.14)"; "(r 12.11.2014)" (Tr. at 912.); "(r 12.11.14)" (Tr. at 913.); "(r 12.11.14)"; (R 12.11.2014)". (Tr. at 916.) Whether these represent codes or dates, neither the record nor the parties have clarified, however, Dr. Gitlow's notation of a "mental status exam on 4/9/14" and his recitation of the findings that followed are corroborated from the evidence of record, specifically in reference to Claimant's challenge to Dr. Gitlow's summary of the July 18, 2014 report was "done so with unacceptable inaccuracy".[8] (Document No. 11 at 15.)

The July 18, 2014 treatment note indicates that "[t]hrough the entire session, [Claimant] sat with his hand over his eyes, as if he was crying, but no tears were present. [Claimant's] movements were dramatic and calculated." (Tr. at 834.) Claimant's attitude towards examiner was

---

[8] Dr. Gitlow stated that the mental status exam showed Claimant "to be withdrawn but otherwise normal. He is noted to have no primary psychiatric or addictive disease diagnosed." (Tr. at 902.)

noted to be "defensive" and "impatient". (Id.) His motor behavior was described as "restlessness/figetiness". (Tr. at 835.) Claimant wringed his wrists and bounced his legs, and his mood was described as "depressed" and "irritable". (Id.) Notably, Claimant's affect was described as "incongruent": his "facial expression evoked sadness and crying, but there were no tears and he was able to quickly jump into a different expression – anger or contentment [*sic*]." (Id.) Further, his speech production, language, thought content were "within normal limits"; his thought process "logical"; he was oriented to four spheres; his immediate memory impaired; his "attention/concentration - slow reaction time"; his behavior "dramatic"; and finally, Claimant "gave exaggerated responses to nearly every question." (Tr. at 835-836.) In short, these findings, though briefly mentioned by Dr. Gitlow, mirror the statements he made concerning Claimant's "mental status exam on 4/9/14" in his responses to the ALJ's inquiries. (Tr. at 902.)

Further, with regard to Dr. Gitlow's "insinuation" that Claimant had not completely abstained from alcohol, due to his finding of Claimant's "only partial remission from alcohol dependence" (Id.), the treatment records from Prestera fully corroborate this assessment: a diagnosis dated July 18, 2014 provides "Alcohol Dependence" "ALCOH DEP NEC/NOS-REMISS", and under the "Comments" section, "Sustained Partial Remission; continues to endorse this as main source of distress" (Tr. at 837, 896.); a diagnosis dated September 17, 2014 provides the exact same diagnosis and comment (Tr. at 842.); and a diagnosis dated October 14, 2014 provides the exact same diagnosis and comment. (Tr. at 873.) Dr. Gitlow acknowledged that Claimant reported being sober in the September 17, 2014 record (Tr. at 902.), however, it is clear, he did not "insinuate" Claimant had trouble abstaining from alcohol – Claimant himself reported alcohol being the "main source of distress" and his treatment providers diagnosed him as being

only partially in remission from alcohol dependence. Interestingly, under the "substance abuse" heading from the July 18, 2014 Prestera treatment notes, it was reported that Claimant was "currently using substance(s)" which included alcohol, cannabis, and opioid and morphine derivatives. (Tr. at 858-859.) Claimant indicated that the date of last use was August 29, 2013, which contradicts his statement that he had remained sober for 3.5 years. (Tr. at 831, 876.)

With regard to Claimant's challenge to Dr. Gitlow's summary of Claimant's October 14, 2014 office visit which suggested that despite restlessness and increased motor activity, he found the examination revealed "an otherwise normal mental status" (Tr. at 902.), the undersigned agrees with Claimant that the record indicates that he presented with avoidant and decreased eye contact, a stressed, anxious, and overwhelmed mood, and a labile and broad affect. (Tr. at 871-872.) Claimant also complained of side effects from his sleep medication, including dry mouth and mid-night waking and stated his anti-depressant caused him to feel more anxious, and he continued to break down three times a day. (Tr. at 871.) However, Claimant also reported that he "does feel his mood is more stable and is 'not breaking down' as much". (Id.) The "mental status exam medication management" note indicated that Claimant's general appearance was "appropriate"; his attitude was "cooperative" and "pleasant"; his speech/language were "normal"; he had no hallucinations; his thought processes were "goal directed", "relevant", and "logical"; his thought content was "appropriate"; he was "alert" and "oriented x 4"; and he denied any suicidal or homicidal ideations. (Tr. at 871-872.) It was reported that Claimant seemed to be responding to lamictal, which was to be continued. (Tr. at 874.)

It is clear from the ALJ's decision that he relied heavily on Dr. Gitlow's opinions, who was noted to have expertise in not only psychiatry, but "addiction psychiatry" (Tr. at 822.), which

appears to have substantial relevance and benefit given Claimant's history. Overall, the relevant medical evidence indicates that Dr. Gitlow's opinions were not flawed as alleged by Claimant and that his findings were accurately reflected in the records that were provided to him for his review and analysis, on both occasions. As noted above, the ALJ provided more evidence of record for Dr. Gitlow's review than Psychologist Gettman-Hughes had available during her examination. Indeed, nearly a full year of additional evidence from Prestera, described *supra*, provided a more complete portrait of Claimant's mental impairments from which Dr. Gitlow was able to analyze for the ALJ. Further, it is important to note that the ALJ did not find Claimant's allegations concerning the "intensity, persistence and limiting effects" of his symptoms entirely credible, a finding that is also supported by the objective evidence of record. (Tr. at 23.) In short, there is nothing to suggest that the ALJ's affording greater weight to Dr. Gitlow's opinions was unreasonable or irrational under 20 C.F.R. §§ 404.1527(e)(2)(ii) and 416.927(e)(2)(ii).

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's Motion for Judgment on the Pleadings (Document No. 11.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 12.), and **AFFIRM** the final decision of the Commissioner.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed

Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Copenhaver, and this Magistrate Judge.

The Clerk of this court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: November 18, 2016.

Omar J. Aboulhosn
United States Magistrate Judge